JACKSON LEWIS LLP
    59 Maiden Lane, 39th Floor
    New York, NY 10038
    (212) 545-4000
Kevin G. Lauri (KL 8714)
Shaffin A. Datoo (SD 6929)

ATTORNEYS FOR DEFENDANT
WATERFRONT MEDIA, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINE DRURY,<br><br>                      Plaintiff,<br><br>         -against-<br><br>WATERFRONT MEDIA, INC.,<br><br>                      Defendant. | 05 CV 10646 (JSR)(DFE)<br><br>**DEFENDANT'S LOCAL CIVIL<br>RULE 56.1 STATEMENT** |

       Pursuant to Local Civil Rule 56.1, Defendant, Waterfront Media, Inc., submits the following statement of undisputed facts in support of its motion for summary judgment:

**A.**    <u>**Waterfront Media, Inc.**</u>

       1.    Waterfront Media, Inc. ("Waterfront"), an online publisher of content from self-help experts in the diet, health and fitness field, is headquartered in Brooklyn, New York. (Wolin Dec. ¶ 3).

       2.    With the Internet at the core of its publishing platform, Waterfront connects America's best self-help experts with millions of people looking to improve their lives through advice, tools and online communities through a subscription service that allows its customers to access self-help information online. (Wolin Dec. ¶4).

       3.    Waterfront, an internet start-up company, was founded in March 2002 by Ben Wolin ("Wolin") and Michael Keriakos ("Keriakos"). (Wolin Dec. ¶5).

4.     Wolin is the Chief Executive Officer of Waterfront and oversees its day-to-day operations. (Wolin Dec. ¶1).

5.     Keriakos is the Executive Vice President of Waterfront and is responsible for its business development, marketing, and advertising sales. (Wolin Dec. ¶6; Keriakos Dep. p.12).

**B.     Ken Leung's Work History and Employment at Waterfront**

6.     Ken Leung ("Leung") graduated from Pace University in 1989 with a B.A. in Management Information Systems. (Leung Dec. ¶3).

7.     From 1989 to 1994, Leung worked as a P.C. Support Specialist/Senior Program Analyst for 92nd YMHA. (Leung Dec. ¶4).

8.     From 1994 to 1999, Leung worked as a Systems Development Engineer for TIAA. (Leung Dec. ¶5).

9.     From 1999 to 2001, Leung worked as a Senior Software Developer for Snickelways.com. (Leung Dec. ¶6).

10.    After Snickelways.com, in 2001, Leung worked as a Senior Developer for Belieftnet.com. (Leung Dec. ¶7).

11.    From 2001 to 2002, Leung worked as a Senior Systems Architect for Partsearch.com. (Leung Dec. ¶8).

12.    At Partsearch.com, Leung's salary was $115,000, he was eligible for a bonus and was granted 35,000 stock options. (Leung Dec. ¶9).

13.    In November 2002, Leung, Waterfront's Vice President of Technology and first employee, was hired to build the core technology that would run Waterfront's websites. (Wolin Dep. p.15-16; Keriakos Dep. p.10).

2

14. In 2002, Leung's starting salary was $95,000. (Leung Dec. ¶10).

15. When he was hired, Leung was granted equity in the company as an enticement to join a two-person internet start-up company. (Wolin Dep. p.22; Keriakos Dep. p.32).

16. Leung reported directly to Wolin. (Wolin Dep. p.37).

17. Leung was primarily responsible for technology. (Wolin Dep. p.15, 30-31).

18. At Waterfront, Leung was responsible for: (a) programming and software development (Wolin Dep. p.15, 21; Keriakos Dep. p.34, 39); (b) managing the technology team (Wolin Dep. p.53); (c) quality assurance (Wolin Dep. p.53); (d) coding (Wolin Dep. p.30); (e) database (Wolin Dep. p.30); (f) building the technological infrastructure of Waterfront (Wolin Dep. p.30-31); (g) running Waterfront's websites (Wolin Dep. p.31); and (h) making decisions regarding technology. (Wolin Dep. p.56).

19. In 2003, Leung's salary was $115,000 and he was granted 15,000 stock options. (Exhibit K; Exhibit L).

20. In 2004, his salary increased to $120,000 and he was eligible for a $20,000 bonus which was paid quarterly. (Exhibit K; Plaintiff Dep. p.68).

21. In 2005, his salary was increased to $125,000. (Exhibit K).

C. **Plaintiff's Work History and Employment at Waterfront**

22. Christine Drury ("Plaintiff"), who did not study computer software or computer hardware in school, graduated from Penn State University in 1992 with a B.A. in Journalism and a minor in Art History. (Exhibit M; Plaintiff Dep. p.118-119).

23. From November 1993 to August 1997, Plaintiff worked for various companies in a sales and editorial capacity. (Exhibit M).

24. From August 1997 through May 2000, Plaintiff worked for Tribune Interactive ("Tribune") as an Internet Producer and a Senior Internet Producer. (Exhibit M).

25. From June 2000 through May 2001, Plaintiff worked as a Project Manager for Integrated Communications & Entertainment. (Plaintiff Dep. p.15-16; Exhibit M).

26. Plaintiff did not have any experience in making technological decisions in any of the aforementioned positions. (Plaintiff Dep. p.117-118).

27. From June 2001 through September 2003, Plaintiff worked as a Senior Project Manager for Columbia House (Exhibit M).

28. As Senior Project Manager at Columbia House, Plaintiff was involved in technological decisions. (Plaintiff Dep. p.117-118).

29. Her salary at Columbia House was $85,000 and she was eligible for a bonus. (Plaintiff Dep. p.19).

30. She did not receive any stock options at Columbia House. (Plaintiff Dep. p.19).

31. Prior to August 2003, Waterfront did not have a project manager. (Wolin Dep. p.35).

32. Rather, every employee (approximately 20) was working together to manage each project. (Wolin Dep. p.35; Plaintiff Dep. p.41).

33. However, because Waterfront had grown from two to twenty employees since March 2002, and was planning to launch several products, it needed a full-time employee to organize and manage each project. (Wolin Dep. p.35).

34. Thus, in August 2003, Wolin, who previously worked with Plaintiff at Tribune, contacted her about her coming to Waterfront as a project manager. (Plaintiff Dep. p.24, 37, 39).

35. Wolin offered Plaintiff a salary of $80,000, a bonus of $20,000 and 25,000 stock options (Plaintiff Dep. p.42-43).

36. Instead, Plaintiff negotiated for a salary of $85,000, a $15,000 bonus and 25,000 stock options. (Plaintiff Dep. p.42).

37. Wolin accepted Plaintiff's proposal and on October 1, 2003, Wolin hired Plaintiff as the Director of Project Management. (Plaintiff Dep. p.42, 44; Wolin Dec. ¶9; Exhibit A ¶7).

38. As the Director of Project Management, Plaintiff was responsible for organizing and managing Waterfront's projects and ensuring products were "launched" on-time. (Plaintiff Dep. p.41; Wolin Dep. p.34).

39. At Waterfront, Plaintiff was responsible for: (a) scheduling and meeting project deadlines; (b) hiring and firing; (c) allocating and managing resources; (d) instituting process; and (e) delivering projects. (Wolin Dep. p.70-72; Plaintiff Dep. p.39, 56).

40. Plaintiff reported directly to Wolin. (Plaintiff Dep. 50).

D.  **Plaintiff's New Job Responsibilities**

41. As Waterfront grew, and in light of Plaintiff's performance as a project manager, in March 2004, Wolin promoted Plaintiff to Vice President of Production and Operations and added management of the technology team and quality assurance to her responsibilities. (Wolin Dep. p.36-37; Plaintiff Dep. p.57).

42. Although Plaintiff was assigned to manage the technology team and quality assurance, she was not tasked with the responsibility to build technology. (Wolin Dep. p.39).

43. Rather, she was tasked with making sure that the technology team and quality assurance met their goals with respect to same. (Wolin Dep. p.39).

44. Also, Plaintiff did not have the skill set to perform Leung's job. (Plaintiff Dep. p.122).

45. At deposition, Plaintiff testified as follows:

Q. And Ken was the technology person?
A. Yes.
Q. Did you have the skill set to take Ken Leung's job?
A. No.

(Plaintiff Dep. p.122).

46. This decision limited Leung's management responsibilities and also reduced the number of people who directly reported to Wolin. (Wolin Dep. p.34, 37, 50, 53).

47. The technology team consisted of Ken Leung (who now reported to Plaintiff), Gabriel Chalumeau, Robert Walsh, Kalman Toth, Jenia Dorticos and Raza Kahn. (Wolin Dep. p.36; Plaintiff Dep. p.53).

48. In March 2004, Plaintiff hired Nerissa Wels, a female, to assist her with project management. (Plaintiff Dep. p.61).

49. Thereafter, Plaintiff made additional hires for the technology team, including Nate Jones. (Plaintiff Dep. p.54-55, 60-63).

50. As a result of her new responsibilities, Plaintiff's salary was increased by almost 12%, or $10,000, to $95,000 and her bonus was increased almost 34%, or $5,000 to $20,000. (Plaintiff Dep. p.68).

6

51.     In January 2005, Plaintiff's salary was increased again to $100,000. (Plaintiff Dep. p.69).

E.     **Waterfront's Other Vice Presidents**

52.     In March 2004, when Plaintiff was promoted to Vice President, Waterfront had three other Vice Presidents: (a) Ken Leung, Vice President of Technology, had a salary of $120,000, was eligible for a $20,000 bonus, and had 15,000 stock options (Exhibit K; Exhibit L; Plaintiff Dep. p.68); (b) Geoff Strawbridge, Vice President of Customer Service, had a salary of $110,000, was eligible for a $25,000 bonus, and had 50,000 stock options (Exhibit K; Exhibit N); and (c) Tom Burke ("Burke"), Vice President of Sales, had a salary of $90,000, was eligible for commissions based on sales, and had 25,000 stock options. (Exhibit O).

53.     Michael Keriakos' title is Co-Founder and Executive Vice President. (Wolin Dec. ¶¶5-6).

54.     Brian Cooper's title is Senior Vice President and Chief Financial Officer. (Exhibit P).

55.     Steven Petrow's title is Senior Vice President and Editorial Director. (Exhibit P).

56.     Thereafter, in 2004, Waterfront added one more Vice President: Vince Errico ("Errico"), Vice President of Marketing, had a salary of $125,000, was eligible for a $15,000 bonus, and was granted 40,000 stock options. (Exhibit Q).

57.     In 2005, Waterfront added three additional Vice Presidents: (a) Karim Farag, Vice President of Business Development; had a base salary of $165,000, was eligible for a bonus of $110,000 which was based on certain advertising revenues, and was granted 50,000 stock options (Exhibit R); (b) Lizzy Klein, Vice President of Product Management and

7

Development, and had a salary of $155,000, was eligible for a bonus of $30,000, and was granted 15,000 stock options (Exhibit K; Exhibit S); and (c) Julie Fenster, Vice President and General Counsel, who worked four days a week, had a base salary of $150,000, was eligible for a bonus of $22,500, and was granted 20,000 stock options. (Exhibit T).

58.     Lizzy Klein was hired by Wolin in September 2003 as the Director of Product Management and Development. (Klein Dep. p.18; Exhibit S; Wolin Dec. ¶12).

59.     Her starting salary was $145,000. (Exhibit S).

60.     Scott Wolf's title is Senior Vice President of Sales. (Exhibit U).

**F.     Plaintiff's Performance Problems**

61.     Beginning in September 2005, Wolin had several discussions with Plaintiff about hiring a Chief Technology Officer ("CTO") to manage the technology department, including managing the technology team and quality assurance. (Wolin Dep. p.133; Plaintiff Dep. p.155, 220, 223-224).

62.     Plaintiff agreed with Wolin that he should hire a CTO. (Plaintiff Dep. 155).

63.     Prior to September 2004 Plaintiff was adequately managing the technology team and quality assurance; however, beginning in September, her work performance began to decline and in January 2005, Wolin relieved her of her technological responsibilities. (Wolin Dep. p.75-76, 91).

64.     Specifically, after September 2004: (a) the technology department was not running efficiently (Wolin Dep. p.91); (b) the technologists, in particular Ken Leung and Nate Jones, were extremely unhappy with the way Plaintiff was managing the technology group and with the decisions she was making (Wolin Dep. p.76-77, 79; Jones Dep. p.35-36); (c) Plaintiff did not implement an adequate bug-tracking system for the products (Wolin Dep. p.124); (d)

Plaintiff failed to establish relationships with Yahoo, Hotmail and AOL to ensure e-mail delivery (Wolin Dep. p.78-80); (e) Plaintiff was unable to resolve technological problems with Waterfront's e-mail delivery system (Wolin Dep. p.79-80; Cooper Dep. p.28-29); and (f) Plaintiff pursued the Funnel 2.0 upgrade, a software product, which proved to be a bad decision because it wasted Waterfront's resources since it was never implemented. (Wolin Dep. p.76-77, 88; Jones Dep. p.40).

65. At deposition, Jones testified as follows:

Q. So I'm trying to understand what it is, what it is specifically that Chris did not do. If she was holding these meetings and everybody sat around and discussed what it is they had done and what it is they were going to do and when they would finish it, what was it that she needed to do that she was not doing?
A. Software development process requires a lot of integration between a lot of departments and people need to be able to know that when they finish this, this is the next thing they were going to work on, and I finished this so I can pass this off to you and you can work on this, and there was none of that so there was just a jumble of people working on different things and no integration about how it fit together.
Q. Now, did anybody complain to Chris at these meetings about that?
A. I don't recall but probably. Probably shouldn't say that, but yeah.
Q. Did you complain?
A. I complained to other people.
Q. Who did you complain to?
A. Ken and Ben.

(Jones Dep. p.35-36).

66. In addition, Plaintiff admitted that she was being spread too thin. (Wolin Dep. p.134; Plaintiff Dep. p.89).

67. As a result, she was having difficulties performing her project management responsibilities. (Wolin Dep. p.69-70). For example, Lizzy Klein, Director of Product Management and Development at the time, complained to Wolin about communication problems that were being caused by Plaintiff, that she was not moving Waterfront's most

9

significant and most expensive product launch to date forward and that she was not satisfied with the way Plaintiff was managing the What To Expect Project. (Wolin Dep. p.76, 89; Klein Dep. p.28-30, 32-33, 35, 37-38; Exhibit V).

68. At deposition, Lizzy Klein testified as follows:

Q. Let me strike that question. Let me ask you what you wanted Chris to do on What to Expect.
A. To develop project schedules, to deliver on the functional specifications and launch the product on time.

\* \* \*

Q. That was your expectation that is what she would do?
A. Yes.
Q. And she did not do that?
A. Correct?

\* \* \*

Q. Did she develop a project schedule?
A. No.

\* \* \*

Q. Do you recall complaining to anyone about Chris's performance?
A. Yes.
Q. And to whom did you complain.
A. Ben.
Q. And what did you say?
A. That I wasn't getting the schedules or support that I needed to build the product.

\* \* \*

Q. Can you recall how many occasions you complained?
A. Not exactly.
Q. Well, even generally?
A. Between three and five.

\* \* \*

Q. Eventually when did the problem get resolved?
A. When I asked Geoff to have Nerissa assigned to my project.

10

\* \* \*

> Q. Were there any other operational problems besides Chris's not producing a schedule for you that were a source of concern?
> A. I did not feel the technology team had leadership.
> Q. What do you mean by that?
> A. Had sufficient leadership or management to do their jobs well and keep everyone moving on the same plan.
> Q. Did you express that to Ben, as well?
> A. Yes.

(Klein Dep. p.28-30, 32-33, 35, 37-38).

69. What To Expect is the online companion guide to the book What To Expect When Expecting, which provides subscribers, through a customized program, essential tips, advice, tools, answers and support regarding pregnancy. (www.whattoexpect.com; www.waterfrontmedia.com).

70. As a result of her poor performance, Plaintiff was removed as project manager for the project and was replaced by Nerissa Wels, her subordinate. (Klein Dep. p.35; Exhibit V).

71. At the end of the 2004, Wolin, who had decided in February 2004 to assign Plaintiff the technological responsibilities, determined that she had failed in the performance of those responsibilities and he reassigned those responsibilities to Geoff Strawbridge. (Wolin Dep. p.91-92).

## G. Geoff Strawbridge's Work History and Employment at Waterfront

72. Geoff Strawbridge ("Strawbridge") graduated from Trinity College in 1993 with a B.A. in English Literature. (Strawbridge Dep. p.6).

73. In 1995, he graduated from the University of St. Andrews in Scotland with a Masters in Management, Economics and International Relations. (Strawbridge Dep. p.6).

11

74. From January 1996 to February 1997, Strawbridge worked for Netmarket ("Netmarket"), an internet start-up company, as a Manager in Interactive Services. (Exhibit W).

75. In that position, he worked in the marketing department and developed advertising campaigns and executed media buys. (Strawbridge Dep. p.11-12).

76. From February 1997 to July 1997, Strawbridge worked for Cendant Internet Engineering ("Cendant"), who had acquired Netmarket, as a Business Analyst. (Exhibit W).

77. In that position, he worked as a liaison between the marketing and technology departments. (Strawbridge Dep. p.18).

78. From July 1997 through July 1998, Strawbridge worked for Cendant as an Interactive Product Manager. (Exhibit W).

79. In that position, he developed and marketed products and worked closely with the technology department. (Exhibit W; Strawbridge Dep. p.22).

80. From August 1998 to July 1999, Strawbridge worked for Tripod, a subsidiary of Terra Lycos, an internet search engine, as a Product Manager. (Exhibit W; Strawbridge Dep. p.24, 27).

81. In that position, he developed membership products and programs to recruit, retain and reward Tripod's customers. (Exhibit W).

82. From July 1999 to May 2000, Strawbridge worked for Tripod as the Director of Product Management. (Exhibit W).

83. In that position, he was responsible for membership development and worked closely with the technology department. (Strawbridge Dep. p.28-29).

84. From May 2000 to November 2002, Strawbridge worked directly for Terra Lycos as a Director of Customer Service. (Exhibit W).

85. In that position, he worked closely with quality assurance and technology department, implemented an e-mail management system, and launched an on-line self-help and quality assurance process for customers. (Exhibit W).

86. From November 2002 to August 2003, Strawbridge worked for Terra Lycos as a Global Director of Web Publishing. (Exhibit W).

87. In that position, he managed technology, operations, product management and customer service teams. (Strawbridge Dep. p.39).

88. His salary at Terra Lycos was $115,000 and he was eligible for a bonus in the amount of 20% of his salary. (Strawbridge Dep. p.41).

89. In September 2003, Strawbridge was hired by Waterfront as the Vice President of Customer Service at its facility in North Adams, Massachusetts. (Exhibit W).

90. Strawbridge, who lived in Massachusetts, bought a house in Williamstown where he lived with his wife and daughter. (Wolin Dep. p.114; Cooper Dep. p.45).

91. His starting salary at Waterfront was $110,000 and he was eligible for a $20,000 bonus to be paid quarterly. (Strawbridge Dep. p.43).

92. In addition, he was granted 50,000 stock options and was given a $5,000 signing bonus. (Strawbridge Dep. p.43).

93. On January 1, 2005, his salary was increased to $125,000. (Strawbridge Dep. p.46).

94. In mid-January 2005, Wolin approached Strawbridge about moving to New York to assume Plaintiff's technological responsibilities on an interim basis until a CTO could be hired. (Wolin Dep. p.92).

95. Wolin believed Strawbridge was qualified for the position because: (a) he had prior experience managing technologists at Terra Lycos; (b) he was succeeding in managing Waterfront's customer service department in Massachusetts, which was one of its largest departments; (c) he had 1½ years of experience at Waterfront and was familiar with its technology; and (4) he had experience managing a complicated technological infrastructure with high volume. (Wolin Dep. p.92-94).

96. Strawbridge agreed to assume the new title and responsibilities on an interim basis until a CTO could be hired. (Exhibit X).

97. He began his new role in February 2005. (Exhibit X).

98. From March 2005 to August 2005, as Vice President of Production and Operations, Strawbridge was primarily responsible for: (a) managing the technology team; (b) quality assurance; (c) reorganizing Waterfront's design function; (d) re-establishing priorities and process; (e) improving communication; and (f) laying the groundwork for a content management system. (Exhibit X).

99. As a result of his new responsibilities, Strawbridge's salary was increased from $125,000 to $135,000 and he was granted an additional 10,000 stock options. (Exhibit X).

100. In addition, because Strawbridge and his family had to temporarily relocate from Massachusetts, but continued to pay a mortgage on their house there, Waterfront agreed to temporarily pay for the rental of a furnished two-bedroom apartment in Brooklyn,

including all real estates fees in connection with the rental of same, pay for parking and a portion of schooling costs for Strawbridge's daughter. (Exhibit X; Wolin Dep. p.112-115).

101.   The value of these additional benefits was approximately $5,600 per month. (Strawbridge Dep. p.93).

102.   The purpose of these additional benefits was to reimburse Strawbridge for his living expenses resulting from the temporary nature of his move. (Wolin Dep. p.112-115).

103.   In September 2005, Waterfront hired John Deragon, CTO, who assumed Strawbridge's technological responsibilities. (Wolin Dec. ¶14).

H.   **Plaintiff's Employment After Strawbridge's Arrival**

104.   While Plaintiff's technological responsibilities were reassigned, she maintained her project management responsibilities and continued to manage Nerissa Wels, the other project manager, and now reported to Strawbridge. (Wolin Dep. p.95-96, 109).

105.   As a result of the reassignment, Plaintiff's title was revised to Vice President of Project Management. (Plaintiff Dep. p.121).

106.   She did not suffer a loss in salary, bonus, benefits, or opportunity for promotion because of the reassignment. (Plaintiff Dep. p.158; Exhibit K).

107.   When Plaintiff brought to Waterfront's attention that she was not on the management distribution list, she was put back on the list. (Plaintiff Dep. p.131-133).

108.   Plaintiff never had a formal job description when she was the Director of Project Management or the Vice President of Production and Operations. (Plaintiff Dep. p.154).

109.   Nevertheless, Plaintiff was given a job description. (Exhibit Z).

110.   In early-April 2005, Plaintiff and Strawbridge had a miscommunication over a missed deadline which he apologized for. (Plaintiff Dep. p.151-152; Exhibit AA).

111.    Plaintiff was never uninvited from or told not to attend any meetings. (Plaintiff Dep. p.104).

112.    In fact, Strawbridge had a discussion with Plaintiff about attending meetings and left it up to her to decide whether or not to attend. (Plaintiff Dep. p.104; Strawbridge Dep. p.138).

113.    Several employees shared offices when Waterfront moved to the eighth floor because some of the space was not built out. (Ruegg Dep. p.127-130).

114.    Strawbridge shared an office with Ken Leung and Nate Jones, and Wolin shared an office with Michael Keriakos and Brian Cooper. (Plaintiff Dep. p.97-99).

I.      **Plaintiff's Resignation**

115.    In mid-April 2005, Plaintiff informed Waterfront that she was going to file a Charge of Discrimination with the Equal Employment Opportunity Commission. (Exhibit Y).

116.    In late-July 2005, Plaintiff voluntarily resigned from Waterfront to accept new employment. (Plaintiff Dep. p.35).

117.    After her resignation, Plaintiff chose not to exercise her stock options because she was worried about the direction of the company and whether Waterfront's stock would have any value. (Plaintiff Dep. p.168-169)

118.    At deposition, Plaintiff testified as follows:

Q.  Did Mike, Ben or Brian ever make any statements to you that lead you to the conclusion that they had a bias against women?
A.  Not to my recollection.
Q.  And did Mike, Ben or Brian take any actions that lead you to the conclusion they had a bias against women?
A.  Not that I recall.

(Plaintiff Dep. p.147).

Dated: June 21, 2006
      New York, New York

                                         Respectfully submitted,

                                         JACKSON LEWIS LLP
                                       59 Maiden Lane, 39th Floor
                                       New York, New York 10038
                                       (212) 545-4000

By: _____
                                       Kevin G. Lauri (KL 8714)
                                       Shaffin A. Datoo (SD 6929)

                                       ATTORNEYS FOR DEFENDANT
                                       WATERFRONT MEDIA, INC.